```
             UNITED STATES DISTRICT COURT
              DISTRICT OF NEW HAMPSHIRE
```

Todd M. Horstkotte

  v.           Civil No. 08-cv-285-JL
              Opinion No. 2010 DNH 058
Commissioner, New Hampshire
Department of Corrections, et al.

## OPINION AND ORDER

This civil rights case involves alleged retaliation by correctional officers against an inmate for threatening to file grievances.  Plaintiff Todd M. Horstkotte, formerly an inmate at the New Hampshire State Prison, brought this action against the Commissioner of the Department of Corrections, the prison warden, and various prison guards under 42 U.S.C. § 1983.  He alleges that the guards retaliated against him by placing him in the dayroom, administering a strip search, and filing a disciplinary report.  This court has jurisdiction under 28 U.S.C. § 1331 (federal question).

The defendants have now moved for summary judgment.  See Fed. R. Civ. P. 56.  Horstkotte, who is proceeding pro se, has not objected.  After reviewing the summary judgment record and hearing oral argument, this court grants the motion.  The officers' challenged actions were de minimis and thus insufficient to support a retaliation claim.  Moreover, under

applicable First Circuit precedent, there is insufficient evidence in the record to create a genuine issue of material fact as to whether the officers acted with retaliatory intent.

## I. **APPLICABLE LEGAL STANDARD**

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  An issue is "genuine" if it may reasonably be resolved in either party's favor at trial, and "material" if it has the capacity to sway the outcome under applicable law.  Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quotations omitted).  In making this determination, the "court must scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor."  Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003).

As noted, Horstkotte has not responded to the defendants' motion for summary judgment.  Under this court's local rules, where the non-moving party does not properly oppose the summary judgment motion, "[a]ll properly supported material facts set forth in the moving party's factual statement shall be deemed

admitted." L.R. 7.2(b)(2); see also De Jesus v. LTT Card Servs., Inc., 474 F.3d 16, 20 (1st Cir. 2007). Summary judgment does not, however, "automatically follow" from the lack of a response. Stonkus v. City of Brockton Sch. Dep't, 322 F.3d 97, 101 (1st Cir. 2003). The court still must evaluate whether the moving party's submission meets the summary judgment standard. See Fed. R. Civ. P. 56(e) ("If the adverse party does not . . . respond, summary judgment, if appropriate, shall be entered against the adverse party.") (emphasis added).

Consistent with this approach, the following background summary is based on the statement of facts in the defendants' motion, which is supported by affidavits and other authenticated prison records.[1]

## II. BACKGROUND

On the morning of January 13, 2008 corrections officer Matthew Smith was distributing medication to the inmates in the Secure Housing Unit (SHU) of the New Hampshire State Prison,

---

[1] While Horstkotte explained at oral argument that he disagrees with aspects of the defendants' factual statement, he was afforded an opportunity to respond to the defendants' motion and chose not to do so. Horstkotte was also presumably aware of the consequences of failing to respond to a summary judgment motion, as this court expressly addressed the issue in a previous suit he brought. See Horstkotte v. Comm'r, N.H. Dep't of Corr., 2009 DNH 190 (citing L.R. 7.2(b)(2)).

where Horstkotte was an inmate.  At approximately 5:30 a.m., Horstkotte told Officer Smith that he had not received his medication, and Officer Smith responded that Horstkotte's medication card was empty.  At around 6:30 a.m., corrections officer Brian Benard was performing a routine health and safety check of the inmates during the last round of his shift.  Horstkotte asked Officer Benard to check on the status of his medication and told Officer Benard that he had already spoken to another officer about the situation.  Officer Benard responded that it was the end of his shift and it was not his responsibility, but that he would speak to the other officer regarding the situation.  Horstkotte then accused Officer Benard of refusing him medical attention.

After completing his rounds, Officer Benard checked the medication room and confirmed that Horstkotte had already exhausted his prescription.  He returned to Horstkotte's cell, placed the empty card against the door grate and told Horstkotte that no refills were available.  Horstkotte insisted that he should have received his medication because he had previously given a refill slip to a nurse, and threatened to file a grievance under Prison Policy and Procedure Directive ("PPD")

1.16.[2]  Officer Benard told Horstkotte that it was inappropriate to use the threat of grievances to get what he wanted. Horstkotte continued to insist on receiving his medication and became loud, disruptive, and belligerent, which triggered additionally disruptive shouts of "shut up" from other inmates on the tier trying to sleep.

Another corrections officer, Ryan Flynn, overheard the exchange between Officer Benard and Horstkotte, noticed that it was escalating, and intervened.  Officer Flynn recalled that Horstkotte appeared "unstable, shaking and erratic, which [was] not his typical behavior."  Aff. of Corrections Officer Ryan Flynn ¶ 4.  Officer Flynn overheard Horstkotte's statements that Officer Benard had engaged in misconduct and recalled his threats to file grievances and have Officer Benard fired.  To avoid any further disruptions on the tier, Officer Flynn determined that it was necessary to place Horstkotte in the dayroom for a short "cooling off" period.  In an affidavit citing the applicable Policy and Procedure Directive, Warden Richard Gerry explained that standard prison operating procedures authorize SHU staff to bring inmates to a dayroom for a "cooling off" period when they become agitated or disruptive.  Aff. of Warden Richard Gerry ¶ 2.

---

[2]See Knowles v. N.H. Dep't of Corr., Comm'r, 538 F. Supp. 2d 453, 458-59 (describing the prison's three-level grievance procedure as set forth in PPD 1.16).

Officer Flynn handcuffed Horstkotte and escorted him to the dayroom. Officer Flynn gave Horstkotte the customary pre-strip search warning and instructions, and conducted the search. At no point did Horstkotte complain about being brought into the dayroom or about the manner in which the strip search was conducted. Warden Gerry further explained that standard operating procedures under the applicable Policy and Procedure Directive authorize a strip search of any inmate who has been placed in a dayroom at the SHU, except when the inmate has been brought into the dayroom for routine activities such as the use of telephones or dayroom time. Gerry Aff. at ¶ 3. Prison staff does not need prior permission from the warden to conduct a strip search under these circumstances because all staff members at SHU are under standing orders that any inmate brought to a dayroom for non-routine activities should be strip searched. Gerry Aff. at ¶ 3; see also PPD 5.22, IV(6)(B)(3).

Horstkotte spent approximately one hour in the dayroom until a supervisor, Corporal Robert Tschudin, determined that he had calmed down and could be returned to his cell. Afterward, Officer Flynn filed an incident report, and Officer Benard prepared a disciplinary report against Horstkotte, charging him with threatening staff and disrupting the orderly operation of the prison. After a hearing, Horstkotte was found not guilty of

both charges because they were not sufficiently documented, though by virtue of his failure to object to the motion at bar, Horstkotte does not contest the defendants' assertion that he was disruptive. No further disciplinary action was taken against Horstkotte.

III. **ANALYSIS**

Horstkotte alleges that the defendants retaliated against him for threatening to file grievances, thereby violating his First Amendment right "to petition the Government for a redress of grievances." U.S. Const. amend. I. To prevail on a retaliation claim, Horstkotte must show that "(1) his complaints were protected activity under the First Amendment; (2) the defendants took adverse action against him; and (3) there was a causal connection between the protected activity and the adverse action." Nagle v. Warden, N.H. State Prison, 2009 DNH 195, 15; see also Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008); Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003); Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003); Thaddeus-X v. Blatter, 175 F.3d 378, 386-87 (6th Cir. 1999) (en banc); Cossette v. Poulin, 573 F. Supp. 2d 456, 459 (D.N.H. 2008).

### A. Protected activity

The defendants do not dispute that Horstkotte was engaged in a protected activity. This court therefore assumes, without deciding, that Horstkotte had a First Amendment right to express his intent to file grievances, satisfying the first element of his retaliation claim. See Nagle, 2009 DNH 195, 15 (same assumption made). Horstkotte's claim nonetheless fails to satisfy the other two elements.

### B. Adverse action

As to the second element, Horstkotte must show that the defendants took adverse actions against him that were more than "de minimis" and "would chill or silence a person of ordinary firmness from future First Amendment activities." Morris v. Powell, 449 F.3d 682, 684-85 (5th Cir. 2006) (quoting Crawford-El v. Britton, 93 F.3d 813, 826 (D.C. Cir. 1996) (en banc)). "[C]ertain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations." Thaddeus-X, 175 F.3d at 398. Adverse acts will be considered de minimis when they "cause an inmate only a 'few days of discomfort,' impose 'a [single] minor sanction,' or impose an otherwise constitutional restriction on the inmate." Starr v. Dube, 334 Fed. Appx. 341, 342 (1st Cir. 2009) (unpublished)

(quoting Morris, 449 F.3d at 685-86) (alteration in original). "In making this determination, the court's inquiry must be 'tailored to the different circumstances in which retaliation claims arise,' bearing in mind that '[p]risoners may be required to tolerate more . . . than average citizens before a [retaliatory] action taken against them is considered adverse.'" Davis, 320 F.3d at 353 (quoting Dawes v. Walker, 239 F.3d 489, 493 (2d Cir. 2001)) (alteration in original). In his complaint, Horstkotte did not allege that a specific incident was retaliatory but instead referred to the entire sequence of events on January 13, 2008. Whether viewed individually or taken together, the disciplinary report, temporary placement in the dayroom, and strip search do not constitute adverse actions.

The defendants first argue that the disciplinary report against Horstkotte does not constitute an adverse action. Our court of appeals recently held that where disciplinary charges are filed and ultimately dismissed against a prisoner, no "reasonable fact-finder could conclude that inmates of 'ordinary firmness' would be deterred from continuing to exercise their constitutional rights." Starr, 334 Fed. Appx. at 343; see also Nagle, 2009 DNH 195, 16-17. Like the inmates in Starr and Nagle, Horstkotte was found not guilty of the charges and no further disciplinary action was taken against him. The dismissed

disciplinary report would not deter an inmate of ordinary firmness from exercising his First Amendment rights and fails to satisfy the second element of the retaliation test.

The defendants also argue that Horstkotte's brief placement in the dayroom and resulting strip search do not constitute adverse actions. Courts have held that strip searches, in conjunction with other discipline may constitute adverse actions. See Brown v. Carr, No. C-08-170, 2008 WL 4613050, at *3 (S.D. Tex. Oct. 15, 2008)("[T]he retaliatory acts complained of, a disciplinary case resulting in the loss of privileges, and an intrusive strip search, are more than *de minimis*."); Marvel v. Snyder, No. 99-442, 2001 WL 830309, at *8 (D. Del. July 24, 2001) (a strip search, a cell shakedown, removal from inmate job, and transfer to a potentially more dangerous area of the prison could "negatively sway a reasonable prisoner from pursuing redress in the court"). Unlike in these cases, however, Horstkotte's strip search was not combined with any significant discipline, cell shakedown, transfer, or job loss.

Inmates are subjected to strip searches on a fairly routine basis at the New Hampshire State Prison. When inmates at SHU are brought to a dayroom for a "cooling off" period, prison policy, as explained by Warden Gerry, requires them to be strip searched. PPD 5.22, IV(4)(d) & (6)(B)(3). While the applicable regulation

recognizes that strip searches may be "annoying, irritating, [and] time-consuming," PPD 5.22, IV(6)(B)(3), the strip search here is the type of de minimis act that causes an inmate "only a 'few days [or less] of discomfort,' impose[s] 'a [single] minor sanction,' or impose[s] an otherwise constitutional restriction on the inmate." Starr, 334 Fed. Appx. at 342 (quoting Morris, 449 F.3d at 685-86). Given that "[p]risoners may be required to tolerate more than . . . average citizens, before a [retaliatory] action taken against them is considered adverse," Davis, 320 F.3d at 353, this strip search is not an adverse action. The court here does not decide as a matter of law that no strip search, standing alone, could constitute an adverse action. But under this standard, and on this unrefuted record, L.R. 7.2(b)(2), the court cannot say that the strip search of Horstkotte, either standing alone or taken together with the dismissed disciplinary action and brief placement in the dayroom, would deter a person of ordinary firmness from exercising their constitutional rights.

**C. Causal connection**

As to the third element of a retaliation claim--causation--inmates "face a substantial burden" to show that retaliation is "the actual motivating factor" for the adverse action. McDonald v. Hall, 610 F.2d 16, 18 (1st Cir. 1979); see also Jackson v.

Fair, 846 F.2d 811, 820 (1st Cir. 1988).  Horstkotte must demonstrate that the adverse acts would not have happened "but for" the officers retaliatory motive.  McDonald, 610 F.2d at 18.  Because it is difficult to prove a retaliatory state of mind, the plaintiff can introduce circumstantial evidence to establish liability if it supports a reasonable inference of retaliation.  See Beauchamp v. Murphy, 37 F.3d 700, 711 (1st Cir. 1994) (Bownes, J., dissenting); Ferranti v. Moran, 618 F.2d 888, 892 (1st Cir. 1980).  Such evidence may include the chronology of events or temporal proximity between the exercise of a plaintiff's right and the alleged retaliatory act.  LaFauci v. N.H. Dep't of Corr., 2005 DNH 029, 21-22 (citing Ferranti, 618 F.2d at 892; McDonald, 610 F.2d at 18); see also Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995).  "At the summary judgment stage, however, a bare allegation of temporal proximity ordinarily will not be sufficient by itself to prove improper motivation if the defendant has provided a legitimate explanation for the challenged action."  LaFauci, 2005 DNH 029, 22; see also Layne v. Vinzant, 657 F.2d 468, 476 (1st Cir. 1981) ("The mere chronology alleged in the complaint, while sufficient to withstand a motion to dismiss, cannot get plaintiff to the jury once defendants have produced evidence of a legitimate reason."); McDonald, 610 F.2d at 18-19.  "[I]n cases where elusive concepts

such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009).

Based on this record, no reasonable fact-finder could conclude that the officers acted with retaliatory intent when they moved Horstkotte into the dayroom, strip searched him, and filed a disciplinary report.  Despite a close temporal proximity between Horstkotte's protected act and the alleged retaliatory behavior, the defendants have provided a legitimate explanation for their actions.  By all accounts, it appears that Horstkotte had become visibly upset after not receiving his medication.  The officers described his behavior as "belligerent" and by the time that Officer Flynn intervened, the exchange between Horstkotte and Officer Benard had become animated.  Also, the exchange occurred very early in the morning when many of the other inmates were sleeping, and some began yelling "shut up" after being awoken by the disturbance.  When inmates become disruptive on the tier it is common for officers to bring them into a dayroom for a "cooling off" period.  Gerry Aff. ¶ 2.  Part of the process of bringing an inmate into the dayroom for a "cooling off" involves administering a strip search.  Officers do not need prior permission to conduct these strip searches because all staff

13

members at the SHU are under standing orders that any inmate brought into a dayroom for non-routine activities should be strip searched.  Gerry Aff. at ¶ 3; see also PPD 5.22, IV(6)(B)(3)

Thus, it was not merely Horstkotte's threats to file grievances that motivated the officers.  Instead, it was the combination of Horstkotte's disruptive behavior, his insistence in getting his medication, and the fact that he was causing a disturbance among the other inmates that motivated the officers to act the way they did.  This explanation is supported by the summary judgment record presented by the defendants, and Horstkotte has not objected to this record, much less refuted it.  Based on the defendants' explanation and because Horstkotte has not offered any evidence that might give rise to an inference of discriminatory intent, the causation element of his retaliation claim fails as a matter of law.

**IV. CONCLUSION**

For the foregoing reasons, the defendants' motion for summary judgment[3] is GRANTED.  The clerk shall enter judgment accordingly and close the case.

---

[3]Document no. 19.

14

**SO ORDERED.**

/s/ Joe Laplante
Joseph N. Laplante
United States District Judge

Dated:     April 2, 2010

cc:   Todd M. Horskotte, pro se
      Danielle L. Pacik, Esq.